UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

CYNTHIA D. PAJAK,

                  Plaintiff,

       v.

UNDER ARMOUR, INC., *et al.*,

                  Defendants.

No. _____

## MEMORANDUM IN SUPPORT OF
## UNDER ARMOUR, INC. AND UNDER ARMOUR RETAIL, INC.'S
## AND NON-PARTY NICOLE FINCK'S
## MOTION TO QUASH SUBPOENA ON MS. FINCK AND FOR PROTECTIVE ORDER

Defendants Under Armour, Inc. and Under Armour Retail, Inc. ("UA"), and Non-Party Nicole Finck, through their undersigned counsel, move pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure for an Order quashing and/or limiting the subpoenas for documents and for deposition (the "Subpoenas") served on Ms. Finck, a UA employee and member of UA's legal team, by Plaintiff Cynthia D. Pajak in *Pajak v. Under Armour, Inc., et al.*, No. 1:19-CV-160 (N.D. W.Va.) (the "Pajak litigation").[1]

### I.    Introduction

Plaintiff is improperly seeking the production of documents from, and the deposition testimony of, the paralegal member of UA's in-house legal team working on the Pajak litigation, specifically, Nicole Finck, Sr. Lead Litigation Specialist for UA.  Given Ms. Finck's role, it is not surprising that the Subpoenas cover privileged and protected information.  To be clear, Plaintiff

---

[1] In the underlying litigation, UA is represented by Justin Harrison and Grace Hurney of Jackson Kelly PLLC.

1

seeks privileged communications and work-product material for actions taken by UA's in-house legal team *during the Pajak litigation*.  Despite Ms. Finck's and UA's efforts to resolve this matter, Plaintiff persists in demanding that the documents be produced, and the deposition be held, without regard to Ms. Finck's and UA's valid assertions of the attorney-client privilege and work-product protection.  In fact, Plaintiff affirmatively states that she seeks to invade the privilege based on her misinterpretation of West Virginia's crime-fraud exception.  Additionally, Plaintiff also seeks documents and related testimony from Ms. Finck that are entirely unrelated to her current claims and outside a recent order for limited discovery.

Plaintiff's April 12, 2021 subpoena *duces tecum* directed the listed documents be produced in Baltimore, Maryland, where Ms. Finck resides and works for UA:

- documents related in any way to her involvement on a panel during a 2019 conference discussing the e-discovery platform, Relativity ("Relativity Fest 2019").[2]  Exhibit 1 at first, second, third, and sixth bullets;[3]
- any and all documents relating to her efforts as part of the in-house legal team to locate *any* "documents or other things" responsive to Plaintiff's discovery requests.  *Id.* at seventh bullet;
- *any* documents relating to her knowledge of the destruction, spoliation, or non-retention of *any* documents or information responsive to Plaintiff's discovery requests.  *Id.* at eighth bullet;
- a copy of Ms. Finck's curriculum vitae or resume.  *Id.* at ninth bullet.

**Ex. A.1** (emphasis added).

On April 23, 2021, Plaintiff served a "Notice of Videotaped Deposition of Niki Finck."

*See* **Ex. B**.  On April 26, 2021, in accordance with Federal Rule of Civil Procedure 45(d)(2)(B),

---

[2] "Relativity Fest is an annual conference designed to educate and connect the e-discovery and compliance communities.  It's the place for legal and tech professionals to talk shop, connect with your peers, and learn from each other."  https://relativityfest.com/ (visited 4/19/21).  Plaintiff requested information for the 2019 and 2020 events, but Ms. Finck did not serve on a panel at Relativity Fest 2020.

[3] The requests attached to the document subpoena are not numbered.  Thus, they are referred to by the order they appear in the list of bullets.

Ms. Finck objected to the production of the materials demanded in the document subpoena.  **Ex. A** (with Exhibits 1-5).  Thereafter, Ms. Finck (and by extension UA) engaged in sincere attempts to resolve the discovery dispute without Court involvement.  During one such attempt, Plaintiff was asked to provide the scope of inquiry for Ms. Finck's deposition, given her role in UA's in-house legal team in the Pajak litigation.  Plaintiff has refused to do so.  UA and Ms. Finck can only presume that Plaintiff intends to ask questions relating to the documents she improperly seeks, as well as other protected information.

Plaintiff's subpoenas are fundamentally improper and should be quashed or limited by protective order.

## II.      Pajak Litigation Background

UA and Ms. Finck provide this background information as to the recently-amended complaint and case history to aid this Court's understanding of: (a) the scope of Plaintiff's underlying claims; and (b) how, if at all, those underlying claims relate to Plaintiff's State law cause of action for intentional spoliation and the requested discovery from Ms. Finck.

### A.  Plaintiff's Claims Against UA in her Original Complaint.

The original complaint, filed in State court on July 16, 2019 and removed as a diversity action on August 19, 2019, alleged retaliatory discharge against Paintiff's former employer, UA, and her former supervisor, Brian Boucher ("Boucher") based on West Virginia law.  Specifically, Plaintiff alleged wrongful discharge under *Harless v. First National Bank of Fairmont*, 246 S.E.2d 270 (W. Va. 1978) (where employer's discharge of employee violates a substantial West Virginia public policy, the discharge may be actionable) (Count I); violations of the West Virginia Human Rights Act ("WVHRA") of 1967, W. Va. Code § 5-11 *et seq.* (Count II)[4]; negligent hiring,

---

[4] Whether this statute applies to UA when it does not employ the requisite twelve persons working within the state of West Virginia will be certified to the West Virginia Supreme Court.  ECF No.

supervision, and retention (Count III); and intentional infliction of emotional distress/tort of outrage (Count IV).  By way of background, Plaintiff formerly served as a Regional Director for Under Armour Retail, Inc.  Compl. ¶ 9, ECF No. 1-1.  She was responsible for overseeing operations regarding multiple stores and thousands of employees.  **Ex. C**, Pajak Dep. at 111.  Plaintiff claims that her employment was terminated in retaliation for engaging in three separate instances of alleged protected activity.  Stated differently, Plaintiff claims she was fired because she reported the following three incidents to Boucher and UA:

### 1. January 2018.

The first instance occurred in January 2018, when female district manager R.L.[5] sent Plaintiff a text message regarding an incident reported to her by female store manager M.D. involving two male district managers, J.M. and B.C.  *See* ECF No. 1-1 at ¶ 15; **Ex. C**, Pajak Dep. at 43; **Ex. D**, R.L. Dep. at 87.  Neither R.L. nor Plaintiff were present for the reported event.  Specifically, as relayed by M.D., once all of the customers had left the store in Clarksburg, Maryland, J.M. removed his shirt in front of several other employees and put on a piece of women's clothing, in an act she described as "horseplay."  **Ex. E**, M.D. Dep. at 22-25.  M.D. reported to R.L. that she felt the conduct was unprofessional and inappropriate, but specifically mentioned to R.L. that she did not consider it sexual harassment.  **Ex. E**, M.D. Dep. at 24-25; **Ex. D**, R.L. Dep. at 89. M.D. also indicated to R.L. that another male district manager, B.C. (hired by Plaintiff) remarked on the appearance of V.E., a senior visual director.  **Ex. C**, Pajak Dep. at 50-51; **Ex. E**, M.D. Dep. at 33.  Although the comments were not sexual in nature, M.D. thought the comment

---

290 (Citations to ECF numbers refer to filings in the Pajak litigation in the Northern District of West Virginia.).

[5] In order to protect the privacy of non-party witnesses, the parties have agreed not to fully identify those individuals by name in public filings.

was unprofessional and made V.E. uncomfortable.  **Ex. E**, M.D. Dep. at 33-34.  Again, Plaintiff

was not present for the interaction.  **Ex. C**, Pajak Dep. at 46.

Plaintiff "reported" the information to Boucher via text message.  That exchange, and

Plaintiff's deposition testimony about it, reveals that those who were present or involved did not

view it as consequential, and Plaintiff and Boucher both agreed and mutually decided no further

action by Boucher was warranted.[6]

Although Plaintiff did not mention the incident with J.M., she also relayed B.C.'s comment

directed to V.E. to her then Human Resources Business Partner, J.C.  **Ex. F**, J.C. Decl.  When J.C.

in turn contacted V.E., V.E. stated that there was no offense taken and V.E. was not made

uncomfortable.  *Id.*  J.C. relayed this information back to Plaintiff, and it was agreed that no

additional follow-up was necessary.  *Id.*

### 2. April 2018.

The second instance occurred in April 2018 when R.L. reached out to Plaintiff regarding a

photograph that J.M. posted of himself, in form-fitting posing trunks used by body-builders in

competition, on UA's internal social networking website, Yammer.  Compl. ¶ 19; **Ex. C**, Pajak

Dep. at 63-65.[7]  Plaintiff thought such post was inappropriate, because it could be viewed by J.M.'s

---

[6] Because Plaintiff has designated the text messages Confidential under the agreed protective order
entered in this case, UA and Ms. Finck have not attached the text messages, or Plaintiff's deposition
testimony about them, as exhibits.  This evidentiary support will be made available at the Court's
instruction.

[7] The text of the post that accompanied the photos in question is reproduced here:

> 8 years ago I decided I wanted to quit smoking and find something healthy to
> replace the urge. I decided to go to the gym. I weighed 145 lbs and was the smallest
> guy in the gym. I found the biggest guy in the gym who was a body builder. I asked
> him what can I do to get on stage. He told me that I was to skinny and with my
> body frame I wouldn't ever be able to compete in the body building category. He
> said shoot for physique. Well I decided then that if he can do it then so can I. I
> started training 6 days a week and eating healthy. In 2015 I stepped on stage. Not
> physique but body building. I took first place in light weight novice and also won

direct reports and it could make them uncomfortable.  **Ex. C**, Pajak Dep. at 64-66.  However, none of J.M's direct reports relayed any concerns regarding J.M.'s post.  *Id.* at 64-65.  Plaintiff reported the issue to Boucher; another female regional director, T.S.; her female Human Resource counterpart, M.M.; and another senior female manager, S.L.  *Id.* at 71-72.  Although Plaintiff does not recall Boucher's response, T.S. thought it was not a big deal and S.L. indicated that she would look into whether such posting violated any policy.  *Id.* at 71-73.

It appears that Plaintiff also came to the conclusion that J.M.'s posting was not a "big deal," as a month later she was joking about the incident with Boucher over text message.  Specifically, when discussing whether J.M. was an appropriate candidate for a position, Plaintiff made light of the bodybuilding post, but because Boucher did not respond to her (what could be perceived by some as inappropriate) joke, Plaintiff asserts that *he* was not taking the situation seriously.[8]

### 3. November 2018.

The third instance Plaintiff identified took place on November 16, 2018, when Plaintiff participated in a "Listening Session," which was an "open forum" to discuss a November 5, 2018 *Wall Street Journal* article regarding the purported practices and culture at Under Armour.[9]  During

---

the overall novice category.  I decided then that the only person that can stop me from doing what I want is me.

#willfindsaway #wewill #humbleandhungry

J.M. post on Yammer (April 22, 2018 at 5:20 PM).  In the interest of the privacy of the individual depicted, the post itself is not attached as an exhibit.  Suffice it to say, the post depicts nothing more than an individual posing in a body building competition.  If the post itself, including the photographs, would aid in the Court's decision, UA would be happy to make it available for review *in camera*.

[8] Again, the designated Confidential text messages and related deposition testimony detailing this exchange will be submitted if the Court wishes to review them.

[9] As part of the national discussion regarding changing behaviors in the work place, UA voluntarily held a "Listening Session" to give employees an opportunity to discuss the WSJ article.  None of the alleged conduct identified in the article is at issue in this case.

that call, J.M. made comments downplaying the article.  Compl. ¶ 28; **Ex. C**, Pajak Dep. at 84.  At the time, Plaintiff did not have any reaction to J.M's comments.  **Ex. C**, Pajak Dep. at 85.  However, in the weeks that followed, R.L. and a few other female employees allegedly reached out with concerns regarding J.M's comments.  Compl. ¶ 28; **Ex. C**, Pajak Dep. at 85-86.  Plaintiff agreed that J.M.'s comments were "silly" and inappropriate. **Ex. C**, Pajak Dep. at 84.  Plaintiff testified that she relayed these concerns to her female Human Resources counterpart, M.M., although M.M testified that she was not made aware of the concerns.  *Id.* at 87-88; **Ex. G**, M.M. Dep. at 120.  Plaintiff did not relay any concerns to Boucher.  **Ex. C**, Pajak Dep. at 87-88.

### 4. Plaintiff's Termination.

Discovery has confirmed that Plaintiff's employment was terminated for a legitimate, non-discriminatory reason regarding her performance.  In 2018, Boucher, Plaintiff's manager, received feedback from Plaintiff's direct reports regarding their frustration with their lack of development, Plaintiff's communication style, and her tendency to fix problems rather than prevent problems.  **Ex. H**, UA 30(b)(6) Dep. at 53-54.  Eventually, Under Armour employees were asked to participate in a "360 Review" regarding Plaintiff's performance.  **Ex.** C, Pajak Dep. at 176-77.  Thirteen employees, some of whom were selected by Plaintiff and others to which she voiced no objection, participated in this process, and provided feedback as to the specific challenges they faced when working with Plaintiff.  *Id.* at 178, 183-184.  Plaintiff was subsequently placed on a Performance Improvement Plan ("PIP") in September 2018.  ECF No. 92 at 4-5 (attaching performance reviews).  Her PIP concluded in early December 2018, and as a result of her failure to meet the goals of the plan, Plaintiff's employment was terminated on December 10, 2018.  *Id.*

### B.  Plaintiff's Discovery to UA.

Plaintiff served UA with her first set of discovery requests on October 9, 2019, specifically 20 Interrogatories and 74 Requests for Production of Documents.  ECF Nos. 13 & 14.  UA

responded to Plaintiff's first set of discovery requests on November 18, 2019 (by agreement to that date.)  ECF Nos. 32 & 33.  UA supplemented its responses to Plaintiff's first set of discovery requests on January 10 and February 7, 2020.  ECF Nos. 52 & 66.

On April 29, 2020, Plaintiff propounded 42 additional document requests in her Second Set of Discovery Requests to UA.  ECF No. 76.  UA responded on June 19 and September 21, 2020.  ECF Nos. 88 & 122.  On October 6, 2020, Plaintiff served her Third Set of Requests for Production of Documents to UA adding 21 additional document requests.  ECF No. 129.  This was not the last set of document requests UA would receive, as Plaintiff propounded Fourth (42 requests on November 18th, ECF No. 150), Fifth (30 requests on January 9, 2021, ECF No. 197) and Sixth (7 requests on January 14th, ECF No. 204) Sets over the next three months.

Between October 2019 and January 2021, Plaintiff served 216 document requests directed to UA. To date, UA has produced more than 5,000 emails totaling almost 20,000 pages of documentation, in addition to over 3,000 pages of other documents.  Plaintiff also has deposed numerous UA current and former employees.  Further, UA was required to produce a corporate designee(s) to address 118 topics set forth by Plaintiff, which also involved the production of additional documentation.

Under the Court's June 5, 2020 Amended Scheduling Order (ECF No. 86), discovery closed on February 15, 2021.

### C. Relativity Fest 2019 and Plaintiff's Dilatory Disclosure of Ms. Finck as a Witness with Discoverable Information.

For the first time, on February 10, 2021, just five days before the close of discovery in the Pajak litigation, Plaintiff identified Ms. Finck as an "individual who has *discoverable* information that the disclosing party may use *to support its claims* . . . ."  *See* Plaintiff's Second Supplemental Rule 26(a)(1) Initial Disclosures, **Ex. A.2** (emphasis added).  According to Plaintiff, while serving

8

as a member of a panel at the Relativity Fest 2019 conference, Ms. Finck purportedly "acknowledged" that, *prior to using* RelativityOne (the e-discovery platform that was used and is being used in the Pajak litigation to manage the electronically stored data), there were difficulties managing data under certain then-available e-discovery platforms. *Id.* at 3-4. Additionally, Plaintiff contends that Ms. Finck supposedly "acknowledged" that, in the past, UA employees were "encouraged" to delete their text messages. *Id.* at 4. The bases or sources for Plaintiff's assertions were not at that time disclosed to UA. Ms. Finck denies that the discussions that took place during the panel session are being accurately portrayed in Plaintiff's Second Supplemental Disclosure.[10]

Relativity Fest 2019 was held in Chicago on October 20-23, 2019, shortly after Plaintiff propounded her first set of discovery requests to UA. Ms. Finck[11] was a panel member for a session titled, "A New Era for Corporate E-Discovery: How Under Armour Future-Proofed Their E-Discovery Practice With RelativityOne." It was during this panel session that Ms. Finck allegedly made the comments claimed by Plaintiff.

After being asked on numerous occasions to identify the "source" of Ms. Finck's alleged statements, on April 28, 2021, Plaintiff finally disclosed that an individual identified as Anne Frye also attended the panel session in which Ms. Finck allegedly made certain comments. **Ex. I**, Plaintiff's Rule 26(a)(1) Initial Fact Witness Disclosures Regarding Plaintiff's Spoliation Claims. Plaintiff made this disclosure only after Relativity (the host of the conference) produced the attendee list for Ms. Finck's presentation in response to Plaintiff's subpoena. **Ex. J**, L. Rector email

---

[10] Additionally, Plaintiff has not presented any explanation for her 11th hour disclosure of Ms. Finck.

[11] As Plaintiff knows, Ms. Finck also has been working at the direction of Under Armour's in-house legal counsel, as well as outside counsel from Jackson Kelly, PLLC in connection with the claims brought by Plaintiff, specifically UA's discovery responses. *See* **Ex. A.3**, October 8, 2020 email exchange between counsel.

(Apr. 28, 2021 2:35 PM), attaching Relativity's production; **Ex. K**, M. Lantz email (Apr. 28, 2021 3:42 PM), attaching Initial Disclosures.  Although one would not know it from Plaintiff's disclosure, Ms. Frye is actually a lawyer **from the law firm representing Plaintiff.**  Ms. Frye's practice includes e-discovery matters and she is also Plaintiff's counsel's "firm's primary administrator for the in-house Relativity Appliance and is a Relativity Certified User." https://www.steptoe-johnson.com/anne.frye.  One of UA's document productions was made in Relativity-ready ESI format at Plaintiff's counsel's specification.  **Ex. L**, A. Williams letter to UA's counsel (Dec. 17, 2019), at 5.

Despite Plaintiff's law firm having known about the Relativity Fest 2019 presentation since October 2019, Plaintiff waited 15 months to disclose Ms. Finck and her alleged comments and waited an additional three months to reveal Steptoe & Johnson's involvement.  No proffer has been made as to how Ms. Finck's purported statements at Relativity Fest 2019 are relevant to Plaintiff's claim of wrongful termination because they simply are not relevant.

### D.  Plaintiff's Amended Complaint.

Three days after the close of discovery in the Pajak litigation, Plaintiff moved to amend her complaint to add State law claims of negligent[12] and intentional spoliation against UA and co-defendant Brian Boucher or, in the alternative, for an adverse jury instruction based on spoliation.  *See* ECF Nos. 267 & 268 ("Plaintiff's Motion to Amend"), **Ex. M**.[13]  Plaintiff's Motion to Amend did not argue that UA directed any individual to delete text messages.  Nor did Plaintiff's Motion to Amend mention in any way Relativity Fest 2019, much less that any discussions at Relativity

---

[12] Intentional spoliation is a separate cause of action under West Virginia law.  Plaintiff's claim for negligent spoliation, which is an independent cause of action only applicable to third parties, has been withdrawn.

[13] The memorandum (ECF No. 268) is attached here without the exhibits, which also can be submitted in this case is the Court prefers.

Fest 2019 were probative of any issue relating to Plaintiff's claims generally, or spoliation specifically.  And, Plaintiff did not assert that the recent disclosure of Ms. Finck (or anyone else disclosed on the eve of the discovery deadline) formed a basis for any fact to be alleged in the Amended Complaint.

In her proposed Amended Complaint, it was incumbent upon Plaintiff to set forth the pertinent facts that formed the basis of her spoliation claim.  *See* **Ex. M**, ECF No. 267-1.  Yet, Plaintiff did not identify any facts relating to Relativity Fest 2019 as support for her spoliation claim, much less any purported discussions involving Ms. Finck.  In fact, Ms. Finck is not mentioned anywhere in the Amended Complaint.  Instead, the Amended Complaint alleges that UA failed to produce a MyGamePlan performance review (a 2018 Half Time Huddle meeting) and HR Analytics data as it relates to Plaintiff.  *See id.* ¶¶ 38, 83.

As to Boucher, Plaintiff alleges that he spoliated evidence by deleting text messages from his company-issued cell phone after UA issued its Electronic Litigation Hold Notice ("Litigation Hold"), but before he provided the phone to UA for imaging.  *Id*. ¶¶ 40, 91-94.  Plaintiff did not, because she cannot, allege that UA directed any employee, including Boucher, to delete text messages.

Plaintiff also alleges that "UA failed to preserve Mr. Boucher's electronic devices that stored relevant data."  *Id.* ¶ 82.  Noticeably absent is any allegation that UA's alleged failure was intentional or done with the deliberate purpose of destroying evidence relating to Plaintiff's claims. Nor could Plaintiff make such an allegation in good faith.  As set forth in the Amended Complaint, UA, consistent with its preservation obligations, told Boucher not to delete his texts, thereafter obtained a copy of his phone to retrieve all available data on it by "imaging" the phone, and then returned the phone to Boucher.  *Id.* ¶ 38.  According to Boucher, at some unknown point in time

before making his phone available to UA, he deleted certain text messages.  **Ex A.4**, Boucher Dep. at 259, 382-384.  Importantly, Boucher has admitted in Response to UA's Requests for Admissions that UA did not direct, instruct, encourage, or suggest that Boucher delete any text messages during his employment, and never asked him to delete texts relating to Ms. Pajak or her allegations.  **Ex. N**.  Accordingly, even if UA had a duty to maintain physical custody of Boucher's phone after it was imaged — no such duty existed — that failure would not have prevented Boucher's prior deletion of his texts.

### E.  The March 4th Hearing and the Court's Order.

During the March 4th hearing on Plaintiff's Motion to Amend the original complaint, Plaintiff never suggested that additional discovery was necessary to explore the discussions that allegedly occurred at Relativity Fest 2019.  Again, the topics of Relativity Fest 2019 and Ms. Finck were not mentioned in any way during the hearing.

Further, Plaintiff told the court that no additional discovery was required.  Specifically, after counsel stated that Plaintiff disagreed with Boucher's (not UA's) argument that additional discovery was needed on the intentional spoliation claim, Plaintiff's counsel said:

> We have Mr. Boucher's testimony.  We have UA's testimony.  We have what's left of the phone and the devices, and so there's really not [*sic*] need for more depositions or written discovery.  **The record is complete and discovery is closed and we don't intend to ask for any more discovery as it relates to that, and cannot see how any of the other parties would require discovery.**

*See* **Ex A.5**, Hearing Transcript Excerpts at 9:10-18 (Mar. 4, 2021) (emphasis added).

Despite Plaintiff's counsel's assertion that no additional discovery was necessary, the court allowed limited discovery on Plaintiff's spoliation claim anyway, but specifically noted that such additional discovery would be "minimal."  *Id.* at 48:6-7.  The court identified the issues related to Plaintiff's claim of intentional spoliation as follows:  "What Ms. Pajak is alleging is that Boucher's deletion of data from his phone and UA's failure to preserve data in its records evidences their

intent to defeat a potential lawsuit." *Id*. at 55:16-19.  The Court allowed limited discovery on UA's

retention policies or document protocols relating to HR Analytics (*id.* at 56:18 – 57:14) and a

Halftime Huddle (MyGamePlan performance appraisal) that allegedly took place shortly before

Pajak was terminated in December 2018 (*id.* at 59:19 – 61:17).  *See also id*. at 63:25 – 64:8.

However, the court deemed as weak and circular Plaintiff's argument that there was evidence of

UA's intent to destroy evidence and defeat Plaintiff's claims because it does not have the purported

evidence (to the extent it ever existed) from HR Analytics and MyGamePlan.  *Id.* at 56:7-17.

"After hearing argument," on March 8, 2020, the Court ordered "limited discovery for

ninety days (90) for the purposes of developing Pajak's intentional spoliation claim."  ECF No.

292 at 2 (the "Limited Discovery Order").  In connection with the Limited Discovery Order,

Plaintiff served UA with 31 document requests and 12 requests for admission, served 9 subpoenas

*duces tecum* to non-parties for information mostly covered in her discovery requests to UA, and

has requested or subpoenaed 10 individuals for deposition (including another UA 30(b)(6) notice

containing 46 topics).  In response, UA has produced more than 3,000 additional pages

documentation.  Plaintiff also has served "Initial Disclosures" regarding her spoliation claim that

includes not only Ms. Finck, but also Kristin P. Herber, Esq., UA's Managing Counsel-Litigation,

and the lead member of UA's in-house legal team on the Pajak litigation.  *See* **Ex. I**.

### F.  Ms. Finck's Objections and UA's Attempts To Resolve the Disputes Regarding the Subpoenas.

Ms. Finck timely served Objections to the document subpoena on April 26, 2021.  **Ex. A**.

The Objections noted that the discovery on Ms. Finck is untimely because Ms. Finck and her role

in the litigation were disclosed months ago, and standard discovery in the Pajak litigation is now

closed.  *Id.*  Further, the Objections noted that Plaintiff is now straying far outside the scope of the

Limited Discovery Order because the information sought from Ms. Finck does not form any basis

for the spoliation claim in Plaintiff's Amended Complaint. Most fundamentally, Ms. Finck objected because the Subpoena seeks documents regarding the Pajak litigation, including Ms. Finck's role in responding to Plaintiff's discovery, that are clearly and categorically privileged and litigation work-product protected.

Prior to the service of Ms. Finck's subpoenas, UA attempted to negotiate their scope. On April 6, 2021, after receiving an advanced copy of Exhibit 1 to Mr. Finck's subpoena *duces tecum*, UA requested that language be added to the document requests to make clear that Plaintiff was not seeking documents protected by the attorney-client privilege or work-product doctrine. *See* **Ex. O,** J. Harrison email (Apr. 6, 2021). As it related to the Relativity Fest 2019 documents, UA requested that the time frame be limited to before February 10, 2021 (the date when Plaintiff first disclosed Ms. Finck), as any communications thereafter would clearly be covered by a privilege. *Id.* Plaintiff refused. *See* L. Rector email (Apr. 7, 2021), **Ex. P** at 8-9.

Following service of Ms. Finck's objections, on April 27, 2021, counsel for Ms. Finck and Ms. Pajak held a telephone conference regarding the Objections, during which UA's and Ms. Finck's positions as to the privileged and protected information was reiterated to Plaintiff. *See* A. Askew email (Apr. 28, 2021), **Ex. P** at 3-5 (recapping phone conference). During that call, Plaintiff's counsel asserted that he believed that Ms. Finck's objections were not made in "good faith" and that undersigned counsel had engaged in "sanctionable" conduct (upon being challenged to point out specifics, Plaintiff's counsel saw fit to modify that accusation to "potentially sanctionable conduct"). *See* L.R. 104.7 Certificate. He argued that facts relating to Relativity Fest 2019 were covered in the Limited Discovery Order and stated that under a "notice pleading standard" Plaintiff was not required to plead those facts in her Amended Complaint, much less raise them with the Court for consideration when ruling on her Motion to Amend. **Ex. P** at 4-5.

Plaintiff also argued that Ms. Finck and UA engaged in conduct that renders their privileged communications discoverable under the crime-fraud doctrine, but did not present any facts to support this assertion. *Id.* at 3-4. Plaintiff's counsel also stated, without citing any authority, that if a privilege log was not produced, even for post-litigation communications and documents, then privilege is waived. *Id.* at 4. When asked for authority for certain positions, Plaintiff's counsel told undersigned counsel to "fire up Westlaw" and find it ourselves. *See* L.R. 104.7 Certificate.

Hours later, Plaintiff forwarded a prior email string and advised that it contained Plaintiff's position regarding the privilege log and the scope of the examination of Ms. Finck. *See* L. Rector email (April 27, 2021 5:09 PM), **Ex. P.** at 5. Within 24 hours, Ms. Finck responded, addressed the case law identified by Plaintiff, and asked for Plaintiff's authority that West Virginia's narrow crime-fraud exception applied to a spoliation claim, when Ms. Finck's research suggested that it would *not* apply. Ms. Finck also requested authority supporting Plaintiff's position that a privilege log is required for communications that took place during the litigation in which the discovery was propounded, as Ms. Finck found authority that in such circumstance, a log was not required. *Id.* at 4, A. Askew email (Apr. 28, 2021 4:54 PM). Finally, Plaintiff was asked three questions originally raised in the initial phone call, to which she had not responded, namely: (1) who was her "source" for her "first-hand account" of Ms. Finck's purported statements at Relativity Fest 2019;[14] (2) what was the evidence showing that UA (or Ms. Finck) directed Boucher to delete texts; and (3) what was the evidence that Ms. Finck had engaged in any type of "crime" or "fraud." *Id.* at 5.[15]

---

[14] Plaintiff never responded to this question. However, as previously mentioned, on April 28th Plaintiff disclosed a lawyer from the law firm representing her, Ms. Frye, as an attendee of Relativity Fest 2019. This disclosure was never sent to undersigned counsel by Plaintiff's counsel.

[15] Ms. Finck relied in part on *Barber v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 3:14-CV-27349, 2015 WL 6126841, at *2 (S.D. W.Va. Oct. 16, 2015), a case in which Plaintiff's current counsel,

Rather than substantively responding to Ms. Finck's inquiries, on April 29th, just two days after counsel had the initial telephone conference, in an early morning email, Plaintiff advised that she had unilaterally determined that the parties were at an impasse and that the Court needed to be involved. *Id.* at 3, L. Rector email (Apr. 29, 2021 5:52 AM). Despite Plaintiff's unwillingness to make a sincere attempt to resolve the dispute, Ms. Finck responded before noon that day, continued to lay out her position with supporting authority, and invited Plaintiff to discuss the matter further, including a specific request to determine the proper scope of any deposition of Ms. Finck. *Id.* at 1-2, A. Askew email (Apr. 29, 2021 11:25 AM). But Plaintiff's refusal to engage was steadfast, and within hours of Ms. Finck's response, Plaintiff's counsel indicated that she would be filing a motion to compel with this Court, a request that the matter be transferred back to West Virginia, and a request for expedited briefing. **Ex. Q**, L. Rector email (Apr. 29, 2021 1:01 PM).

The next day, Plaintiff's counsel changed tack to assert for the first time that the privilege and protection issues pertaining to the Subpoenas directed to Ms. Finck had already been decided in the Pajak litigation, representing that "The attached order denying Under Armour's objections to the Plaintiff's 30(b)6 deposition notice is dispositive of the privilege, work product and related objections that you have asserted with regard to Ms. Fink's document and deposition subpoenas." **Ex. R**, L. Rector email (Apr. 30, 2021), attaching Order (ECF No. 251). The Order relied on by Plaintiff, however, says no such thing and, on the next business day, Ms. Finck and UA made that clear. **Ex. S**, A. Askew email (May 3, 2021).

In reality, a review of the underlying briefing, hearing transcript, and order of U.S. Magistrate Judge Michael J. Aloi all support Ms. Finck's Objections on the basis of privilege and

---

Larry Rector, argued on behalf of a Steptoe & Johnson, PLLC lawyer who had been subpoenaed that the crime-fraud exception could not invade privileged and work-product protected information.

work product protection. **Ex. S**.  In particular, in response to UA's concerns that Plaintiff's corporate designee topics sought to invade the attorney-client privilege and work-product protection, Plaintiff represented that she sought only the "bare facts" and "does not seek to discover the mental impressions or advice of counsel as they relate to Under Armour's defenses." *Id.* (quoting ECF No. 224 at 13).  The Court specifically relied on Plaintiff's representation as the basis for ruling that the 30(b)(6) deposition could proceed as noticed, and UA could object in real time "should Plaintiff's counsel stray from permissible lines of questioning in this regard." *Id.* (quoting ECF No. 236 at 2-3).  Nothing about UA's objections to that Order, or the Court's Order overruling the objections, affected the scope of the privilege and protection, or the permissible bounds of discovery. *Id.*

Ms. Finck and UA once again invited Plaintiff to discuss the matter further and asked Plaintiff to advise if she still intended to file a motion to compel. *Id.*  As had been raised in the initial phone call (and consistent with UA's position before the subpoena was served, **Ex. P** at 8-9), Plaintiff was reminded that UA's position aligned with Ms. Finck's and that if she was determined to pursue that matter, UA would be filing a motion to quash. **Ex. S** at 2.  Plaintiff has not responded.[16]

---

[16] On April 30, 2021, UA produced documents responsive to Plaintiff's Requests for Production of Documents related to Relativity Fest 2019.  These documents, although not relevant under the Order for Limited Discovery, were provided in an effort to streamline the more important dispute as to privileged and protected information.  Along the same lines, on May 4, 2021, and without conceding that the information is relevant to the Pajak litigation (it is not), Ms. Finck produced additional non-privileged or protected documents related to Relativity Fest 2019. **Ex. T** (T. Cooper email May 4, 2021, including message from A. Askew).  These documents, including Ms. Finck's handwritten notes and posts from social media accounts to which UA did not have access, are not relevant, but are responsive to the First and Second Pajak Bullets in the document subpoena by the overbroad terms of those requests.  Neither Ms. Finck, nor UA, however, produced any communications or other documents created after February 10, 2021 (when Ms. Finck was first identified by Plaintiff as a witness) that might mention or pertain to Relativity Fest 2019.  Any

Having received no response to UA's last several attempts to continue to move the dispute to a resolution, the following Document Requests are still at issue.  Plaintiff's First, Second, Seventh, and Eighth Bullet Points each, by their terms and by Plaintiff's positions taken in follow-up communications, seek privileged and work-product protected information.  As to the First and Second Bullets, because they are not limited in time, these Requests cover not only communications Ms. Finck might have had surrounding Relativity Fest 2019 itself, but also communications that would have taken place after Plaintiff identified Ms. Finck as a witness based on her participation in that conference.  Worse, the Seventh and Eighth Bullets explicitly seek information regarding the UA legal team's efforts in the Pajak litigation to retain documents and to respond to Plaintiff's discovery.  These Requests essentially span the entire two-plus years of litigation since early 2019, when Plaintiff's counsel first contacted UA.

## III.    Applicable Legal Standards

### A.  When Quashing or Modifying a Subpoena Is Required

Under Rule 45, "[o]n timely motion, the court for the district where compliance is required must quash or modify a subpoena that . . . requires disclosure of privileged or other protected matter, if no exception or waiver applies."  Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv).  Furthermore, under Rule 45(d)(1), "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1); *see also Innovative Therapies, Inc. v. Meents*, 302 F.R.D. 364, 377-80 (D. Md. 2014) (quashing subpoena due to lack of demonstrated need for documents and declaring grounds for quashing subpoena under 45 as "co-extensive" with the Rule 26

---

such documents, in the context of an ongoing litigation, are presumptively made "because of" that litigation.

standard).  "District courts are afforded broad discretion with respect to discovery generally, and motions to quash subpoenas specifically." *Cook v. Howard*, 484 F. App'x 805, 812 (4th Cir. 2012); *see also Furlow v. United States*, 55 F. Supp. 2d 360, 366 (D. Md. 1999) ("Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required").

This Court's discretion is even broader when analyzing the burden on a non-party, who is entitled to additional protection from improper subpoenas than a plaintiff or defendant.  *See, e.g.*, *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019) ("When discovery is sought from nonparties, however, its scope must be limited even more. . . .  A more demanding variant of the proportionality analysis therefore applies when determining whether, under Rule 45, a subpoena issued against a nonparty 'subjects a person to undue burden' and must be quashed or modified."); *In re Subpoena of Daniel Drasin*, No. 13-00304-ELH, 2014 WL 585814, at *5-6 (D. Md. Feb. 12, 2014) ("These burdens are particularly troubling considering that Drasin has not been accused of any illegality, nor is he a defendant in the Colorado Action."; concluding that issuing court's order for leave to serve subpoena under Rule 26 did not preclude compliance court's separate analysis under Rule 45).  In that regard, the requesting party must demonstrate that the discovery sought will have more than a *de minimis* benefit over and above what the requesting party already has, and that outweighs the burden on the recipient and others who are affected, in terms of time, expense, and privacy and business interests.  *Jordan*, 921 F.3d at 190-91.

### B.  Motion for a Protective Order

"A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending — or as an alternative on matters relating to a deposition, in the court for the district where the deposition will be taken."  Fed. R. Civ. P. 26(c)(1).  "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment,

oppression, or undue burden or expense, including . . . forbidding the disclosure or discovery[.]" Fed. R. Civ. P. 26(c)(1)(a).  "This undue burden category 'encompasses situations where [a party] seeks information irrelevant to the case.'"  *Columbia Gas Transmission, LLC v. 252,071 Acres in Balt. County*, No. ELH-15-3402, 2016 WL 7167979, *2 (D. Md. Dec. 8, 2016) (quoting *U.S. Home Corp. v. Settlers Crossing, LLC*, No. DKC-08-1863, 2013 WL 5530282, at *7 (D. Md. Oct. 3, 2013)) (citations omitted).  "Thus, 'if the discovery sought has no bearing on an issue of material fact'—*i.e.*, if it is not relevant—'a protective order is proper.'"  *Id.* (citations omitted).

The Rules state that "the scope of discovery is as follows: Parties may obtain discovery regarding any *nonprivileged* matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]"  Fed. R. Civ. P. 26(b)(1) (emphasis added).  Courts "consider[] the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  *Id.*  However, simply because "requested information is discoverable under Rule 26 does not mean that discovery must be had."  *Nicholas v. Wyndham Int'l. Inc.*, 373 F.3d 537, 543 (4th Cir. 2004).  Rule 26(b)(2)(C) provides that a district court may limit "the frequency or extent of" discovery otherwise permitted under the Rules if it concludes that "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit . . . ."  *Maxtena, Inc. v. Marks*, 289 F.R.D. 427, at 434 (D. Md. 2012) (quoting Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii)).

### C.  Choice of Law — West Virginia Privilege Law and Federal Work-Product Law Apply

In the Pajak Litigation, subject matter jurisdiction is premised on diversity of citizenship. Am. Compl.  ECF No. 267-1.  Plaintiff's claims all arise under West Virginia state law.  *Id.*  Therefore, pursuant to Rule 501 of the Federal Rules of Evidence, West Virginia law controls with respect to attorney-client privilege.  Fed. R. Evid. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."); *Chesapeake & Ohio Ry. Co. v. Kirwan*, 120 F.R.D. 660, 664 (S.D.W. Va. 1988).

Because the work-product protection is not technically a privilege, but rather a type of immunity from discovery, Rule 501 is inapplicable.  *Cont. Cas. Co. v. Under Armour, Inc.*, 537 F. Supp. 2d 761, 769 (D. Md. 2008).  Rather, applicability of the work-product doctrine is assessed according to federal law.  *Id.*

### IV.  Argument

Importantly,  **Plaintiff does not argue — and cannot argue because there is no evidence — that UA directed anyone to delete texts related to Plaintiff's claims**.  In fact, Plaintiff concedes that UA "issued the appropriate litigation hold notices to [its] clients and the respective records custodian." *See* Report of the Parties' Planning Meeting, ECF No. 11 at 2.  There is no dispute that UA's Litigation Hold contained an express provision regarding the preservation of any and all documents and information, including text messages, related to Cynthia Pajak.  Moreover, Boucher unqualifiedly admits that he never deleted text messages at UA's direction, during his employment, or relating to Ms. Pajak or her allegations.  **Ex. N**, Boucher's Responses to UA's RFAs (Apr. 30, 2021).

There is also no dispute that whatever past practices that were purportedly being discussed during the 2019 panel are *not* being used in the Pajak litigation.  Despite the fact that the alleged

past e-discovery practices of UA are not being used *in the Pajak litigation* **and** there is no evidence *in the Pajak litigation* that UA instructed any person to delete text messages in contravention of its clear directive in its Litigation Hold, Plaintiff seeks discovery of this irrelevant information by way of documents and testimony from Ms. Finck, a UA employee and member of the UA in-house litigation team working on the Pajak litigation.

Further, this discovery is untimely.  Discovery closed on February 15, 2021.  To the extent Plaintiff argues that this discovery is timely under the Court's Order for Limited Discovery on Plaintiff's newly-added claim of intentional spoliation, that argument is without merit.  The discussions that allegedly took place at Relativity Fest 2019 do not serve as a basis for Plaintiff's claim of spoliation.  Those purported "facts" are not alleged anywhere in the Amended Complaint, or in Plaintiff's Motion, nor were they mentioned in the two-hour hearing before the court on whether leave to amend should be granted.  Additionally, Ms. Finck was not disclosed (and still has not been disclosed) by Plaintiff as having "discoverable information" relating to anything other than Relativity Fest 2019.  *See* **Ex. A.2**.

Finally, UA, not Ms. Finck, is the custodian of a vast majority of the documents sought. Ms. Finck's efforts, involvement, knowledge, and the like regarding responsive discovery in the Pajak litigation was done entirely at the direction of her employer/client, UA or outside counsel. To that end, such documents are protected from disclosure by the attorney client privilege and/or the work-product doctrine.

### A. Plaintiff improperly seeks UA's privileged and protected information from Ms. Finck.

As noted, the privilege analysis here is governed by West Virginia law.  The Supreme Court of Appeals of West Virginia has held, "To shield evidence from disclosure based upon this privilege, certain enumerated criteria must be satisfied.":

In order to assert an attorney-client privilege, three main elements must be present: (1) both parties must contemplate that the attorney-client relationship does or will exist; (2) the advice must be sought by the client from that attorney in his capacity as a legal adviser; (3) the communication between the attorney and client must be identified to be confidential.

*State of W. Virginia ex rel. Allstate Ins. Co. v. Madden*, 215 W. Va. 705, 713–14, 601 S.E.2d 25, 33–34 (2004) (citations omitted).  Ms. Finck, as a paralegal working on behalf of UA's attorneys, is also covered by the privilege.  *See, e.g.*, *Owens v. First Fam. Fin. Servs., Inc.*, 379 F. Supp. 2d 840, 848 (S.D. Miss. 2005) ("When a paralegal works on behalf of a lawyer who is representing a client, '[t]he attorney-client privilege applies with equal force to paralegals.'" (quoting 81 Am. Jur. 2d Witnesses § 400 (2005))).[17]

### 1. The Subpoenas improperly seek privileged and work-product protected material.

As to the Plaintiff's requests themselves, communications that could be responsive to the First and Second Bullets, regarding Relativity Fest 2019 but made after Plaintiff disclosed Ms. Finck as a witness based on her participation at that conference, were all made in the course of the UA legal team representing its client, in their capacity as legal practitioners, and in a confidential

---

[17] UA has standing to challenge the Subpoenas because UA has a personal right in the documents and testimony sought, and is the holder of the privilege as to that information.  *E.g.*, *In re Grand Jury Investigation*, No. MC 17-2336 (BAH), 2017 WL 4898143, at *5 n.4 (D.D.C. Oct. 2, 2017) (assertion of personal right to attorney-client and work-product privilege confers standing to challenge subpoena (citing *United States v. Idema*, 118 F. App'x 740 (4th Cir. 2005))).  UA, as the client, is the holder of the privilege.  *Mt. Hawley Ins. Co. v. Felman Prod., Inc.*, 271 F.R.D. 125, 132 (S.D.W. Va. 2010), *objections overruled sub nom. Felman Prod., Inc. v. Indus. Risk Insurers*, No. 3:09-0481, 2010 WL 2944777 (S.D. W.Va. July 23, 2010) ("It is well-settled that the client is the holder of the privilege.").  UA's legal team, as counsel, owns the work product.  *State ex rel. Allstate Ins. Co. v. Gaughan*, 203 W. Va. 358, 375 & n.33, 508 S.E.2d 75, 92 (1998) (noting that the attorney has the exclusive right to invoke the work-product protection).  And UA, as the employer, is the owner of all the documents.  *Id.* (applying the authority to invoke or waive work-product protection to the insurer/client for in-house claim documents).  UA and Ms. Finck have both expressly invoked the privilege and supplied the information required under Rule 45(e)(2), via objections, as well as the follow-up communications in counsel's efforts to resolve the disputes.  UA and Ms. Finck have both fulfilled all prerequisites to this Motion.

manner.  Likewise, all of the communications that Plaintiff seeks in the Seventh and Eighth Bullets, regardless of the date, meet each of the three elements of privilege.  Indeed, Plaintiff concedes that she is seeking privileged information and protected work product.  *E.g.*, **Ex. P**, L. Rector email (Apr. 29, 2021 5:52 AM).

As for the analysis of work-product, to determine whether a document was prepared in anticipation of litigation, this Court uses the "because of" test outlined in *National Union Fire Ins. Co. of Pittsburgh v. Murray Sheet Metal Co.,* 967 F.2d 980, 984 (4th Cir. 1992).  *See Sher v. Barclays Cap. Inc.*, No. ELH-11-1982, 2013 WL 3279801, at *3 (D. Md. June 26, 2013) (holding that work product protection applied to preclude opponent's access to spreadsheet of information compiled by counsel from otherwise discoverable sources).  Under this standard, a document is "prepared because of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation."  *Sher*, 2013 WL 3279801, at *3 (citing *National Union*, 967 F.2d at 984).  As with the attorney-client privilege, the work-product protection covers materials prepared by Ms. Finck as a paralegal.  *See, e.g.*, 1 Am. Jur. Trials 275 ("Attorney work product prepared by a paralegal is protected with equal force by attorney work product rule as is any trial preparation material prepared by an attorney in anticipation of litigation." (citing *Wal-Mart Stores, Inc. v. Dickinson*, 29 S.W.3d 796 (Ky. 2000))).

It is clear in this case that Ms. Pajak was pursuing litigation against UA at the time the documents she is seeking were created.  As to the First and Second Bullets in Plaintiff's document requests, during the time period since February 10, 2021, when Plaintiff disclosed Ms. Finck as a witness based on her appearance at Relativity Fest 2019, the communications and documents sought from Ms. Finck, and any testimony related to them, encompass UA's assessments and

analysis of facts and legal issues in this case related to that conference and Ms. Finck's participation in it.  The Seventh and Eighth Bullets go even further, seeking Ms. Finck's and UA's mental impressions regarding UA's legal duties of preservation, as well as judgments as to responsiveness and discoverability of documents.  This is opinion work product that is not subject to discovery from any source.  *See Cont'l Cas. Co.*, 537 F. Supp. 2d at 771 n.8 (citing, among others, *Nutramax Labs., Inc. v. Twin Labs., Inc.* 183 F.R.D. 458, 462 (D. Md. 1998) (in the Fourth Circuit, opinion work is "absolutely immune" or "nearly absolutely immune" from discovery, collecting cases)).

### 2. No privilege log should be required for post-litigation materials.

Under these circumstances, no detailed privilege log is, or should be, required.  When litigation begins, all communications from a litigation support professional with her client's in-house legal team about that litigation are presumptively privileged.  There is no utility to creating a privilege log for such a vast amount of information that clearly falls under the attorney-client privilege or the work-product doctrine.  *Gaughan*, 203 W. Va. at 373 (holding "a general request made with respect to documents prepared after the filing of the underlying suit would unduly burden the court by requiring it to examine a multitude of documents that would ultimately be subject to the attorney-client privilege"); *Hully Enters. Ltd. v. Baker Botts LLP (In re Application for an Order Pursuant to 28 U.S.C. § 1782)*, 286 F. Supp. 3d 1, 7 (D.D.C. 2017) ("To the contrary, when a discovery request demands production of an attorney's records in connection with representation of a client, invocation of the protections of the attorney-client privilege and work-product doctrine may be effective without requiring a detailed privilege log.  Otherwise, any objection to the scope of a discovery demand would be rendered moot because interposing that objection would trigger the very burdensome obligation to prepare a privilege log that the objection would be intended to avoid.") (citing cases); *First Am. Title Ins. Co. v. Bowles Rice, LLP*, No. 16-0219, 2017 WL 6329953, at *8 (N.D. W. Va. Dec. 11, 2017) (overruling objection to order denying

motion to compel and holding that privilege log was not required for clearly privileged communications).  By the same token, all documents created by that individual after the beginning of the litigation were presumptively created "because of" litigation.  *Id.* (citing *Ryan Inv. Corp. v. Pedregal de Cabo San Lucas*, No. 06-3219, 2009 WL 5114077, at *3 (N.D. Cal. Dec. 18, 2009) (denying motion to compel "log of post-litigation counsel communications and work product" because they are "presumptively privileged")).

The Local Rules of this Court recognize this reality in multiple ways.  *See* Appendix D (standard form instructions for requests for production of documents stating, "It is intended that this Request will not solicit any material protected either by the attorney/client privilege or by the work product doctrine which was created by, or developed by, counsel for the responding party after the date on which this litigation was commenced.  If any Request is susceptible of a construction which calls for the production of such material, that material need not be provided and no privilege log pursuant to Fed. R. Civ. P. 26(b)(5) or Discovery Guideline 9(a) will be required as to such material."); *see also* Discovery Guideline 10.d.iii (contemplating categorical privilege logs in appropriate circumstances).

UA and Ms. Finck have made many attempts to resolve these disputes along these lines. In the course of those discussions, Plaintiff made clear that she was not limiting her document requests and planned deposition questioning to non-privileged and non-protected matters.  Rather, as more fully addressed in Section IV.B below, Plaintiff is taking the position that all communications and documents are discoverable under the crime-fraud doctrine.

In essence, Plaintiff still seeks all documents and communications relating to this case — from the initial demand letter all the way through motions and discovery to the present — involving Ms. Finck, a paraprofessional member of UA's legal team.  Because the privilege and work-

product protection so clearly apply to all such communications, pursuant to Fed. R. Civ. P. 45(d)(3)(A)(iii), this Court *must* quash the Subpoena.

### B.  Plaintiff has not and cannot prove the crime-fraud exception.

Plaintiff presents no more than her mere allegations of spoliation to argue that she is entitled to the information sought from Ms. Finck, based on the crime-fraud exception.  Plaintiff is wrong.  She has not met the burden to pierce either the attorney-client privilege or the work-product protection.

As stated by the West Virginia Supreme Court of Appeals, "[t]he elements of the crime-fraud exception, as recognized by the United States Supreme Court in the seminal case of *United States v. Zolin*, 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), require the party seeking to establish the exception to demonstrate, 'through nonprivileged evidence,' 'a factual basis adequate to support a good faith belief by a reasonable person,' 'that *in camera* review of the [privileged] materials may reveal evidence to establish the claim that the crime-fraud exception applies.'"  *Madden*, 215 W. Va. at 718.

Under West Virginia law, the crime-fraud exception is a narrow one.  *Barber v. Sedgwick Claims Mgmt. Servs.*, No. 14-27349, 2015 WL 6126841, at *2 (S.D. W. Va. Oct. 16, 2015) (citing *Kessel v. Levitt*, 204 W. Va. 95, 182-83, 511 S.E.2d 720, 807-08 (1998) ("[W]hen the fraud alleged bespeaks of tortious fraudulent conduct, rather than a true fraud upon the court, the crime or fraud exception does not operate to compel disclosure of the privileged communications.").  It is not at all clear under West Virginia law whether intentional spoliation can constitute the predicate for the crime-fraud exception to the attorney-client privilege.  In communications between counsel before filing this motion, UA's counsel requested any authority showing that West Virginia courts

apply the crime-fraud exception to a West Virginia spoliation claim, but Plaintiff did not respond.[18]
What is clear is that the burden to make a prima facie case requires the proponent to establish *with*
*evidence* that the communications at issue were used to further a crime or fraud.  *See Kessel*, 204
W. Va. at 183 ("the discovering party, and not the party asserting the privilege, bears the burden
of establishing, by prima facie evidence, that a crime or fraud has tarnished the allegedly privileged
communications thereby authorizing their disclosure"); *Madden*, 215 W. Va. at 718 (requiring the
discovering party to "demonstrate an adequate factual basis exists to support a reasonable person's
good faith belief that an *in camera* review of the privileged materials would produce evidence to
render the exception applicable").[19]

Plaintiff has alleged in the Amended Complaint that UA committed intentional spoliation
because human resources statistics related to turnover were not preserved in a certain format of
report (even though Plaintiff has in her possession a 2018 report in a different format containing
the statistics she argues UA spoliated, and that report has been produced in discovery *by Plaintiff*)
and because there is no documentation of a Halftime Huddle performance appraisal meeting in

---

[18] The principal cases relied on by Plaintiff state specifically that spoliation can form a crime-fraud
under *federal* law.  *See Wachtel v. Guardian Life Ins.*, 239 F.R.D. 376, 380 (D.N.J. 2006) (cited
as "Judge Hochberg's opinion" in **Ex. P** (L. Rector email April 7, 2021 2:16 PM) ("under federal
law, the exception can encompass communications and attorney work product 'in furtherance of
an intentional tort that undermines the adversary system itself.'"); *see also Wachtel v. Guardian
Life Ins.*, No. 01-4183 FSH, 2007 WL 1752036, at *1 (D.N.J. June 18, 2007) (quoting *id.*).  In this
diversity case, however, the privilege law of West Virginia controls.

[19] Putting aside whether the crime fraud exception can be predicated on the tort of intentional
spoliation under West Virginia law, the federal standard for the discovering party is essentially the
same.  Plaintiff, as the party asserting the crime-fraud exception, must make a prima facie showing
of evidence that the exception applies to privileged communications or protected work product.
*In re Grand Jury Proceedings #5 Empaneled January 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005).
To make the prima facie showing, Plaintiff is required to present *evidence* that: "(1) the client was
engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to
further the scheme and (2) the documents containing the privileged materials bear a close
relationship to the client's existing or future scheme to commit a crime or fraud." *Id.*  Under any
standard, Plaintiff cannot make a prima facie showing sufficient to warrant any *in camera* review.

late 2018 (even though it is disputed whether this meeting even took place).  When counsel for Ms. Finck and UA attempted to learn from Plaintiff's counsel the evidentiary basis for the claim that UA used the advice of its legal department to further intentional spoliation of evidence, no further facts were provided.

Instead, Plaintiff attempts to paint UA with the brush of her allegations of document destruction by Boucher, but whether Boucher himself failed to preserve any evidence is a separate question from whether UA played any part in such alleged actions (it did not), let alone with any intent whatsoever.  Indeed, the evidence adduced during Boucher's deposition, as well as during the current period of Limited Discovery, makes clear that UA timely instituted a litigation hold on Boucher's documents and devices in relation to the Pajak litigation, and never directed, instructed, encouraged, or suggested that Boucher to delete any text messages or information regarding Ms. Pajak or her allegations.  **Exs. A.4, N**.

In addition, although it is not alleged in the Amended Complaint, Plaintiff's counsel also alluded during the meet and confer process to Ms. Finck and UA's supposed participation in drafting a declaration by its IT contractor, Steven Kitchen, that Plaintiff claims contains incorrect information regarding Boucher's laptop.  **Ex. P** (L. Rector email April 29, 2021 5:52 AM) (seeking to inquire what role "if any" Ms. Finck played in preparing the declaration).  Here, Plaintiff attaches nefarious motive to Mr. Kitchen, and speculates that privileged and protected communications with UA will support her suspicions that spoliation occurred with the intent to deprive her of certain information in this case.  Plaintiff is putting the cart before the horse.

Plaintiff has the burden to make a prima facie case with evidence that is not privileged; she cannot purport to use as evidence the very privileged communications she now seeks.  *U.S. ex rel. Mayman v. Martin Marietta Corp.*, 886 F. Supp. 1243, 1246–47 (D. Md. 1995).  Parties armed

with much more than Plaintiff cites here have been denied in their attempts to break the opponent's privilege under the crime-fraud exception. *See In re Application for an Ord. Pursuant to 28 U.S.C. § 1782*, 286 F. Supp. 3d at 10 (petitioners' allegations of tampering with foreign courts, supported by 130 pages of exhibits, "fall short of making a *prima facie* showing that the crime-fraud exception would apply").

In particular, a West Virginia federal case in which a plaintiff unsuccessfully sought to discover the files of her adversary's lawyer under the crime-fraud exception is illustrative of the factual showing required to warrant in camera review. *Barber*, 2015 WL 6126841, at *2. In quashing the subpoena on the lawyer, the Court held:

> Although Plaintiff verifies certain factual allegations, the facts established do not lead to an objective, good faith belief that Mr. Heslep's documents will contain evidence supporting the crime-fraud exception. In other words, Plaintiff shows the existence of various facts pertaining to her workers' compensation claim, but does not construct a bridge leading from those facts to the conclusion that Mr. Heslep was probably retained, knowingly or unknowingly, to further a crime or fraud.

*Id.*[20] Like the Plaintiff in *Barber*, Plaintiff in this case bases her crime-fraud argument "on supposition alone." *Id.* at *4. Thus, the result in this case should be the same. The crime-fraud exception does not apply, and the Court must enter an Order quashing the subpoena and protecting UA's privileged and protected materials from discovery and protecting Ms. Finck from being subjected to any such questioning during her deposition.

---

[20] Plaintiff's accusations are a far cry from the type of affirmative and intentional fraudulent conduct that has been found to warrant application of the crime-fraud exception. For example, the crime-fraud exception has been applied under West Virginia law where there was evidence of specific communications between client personnel, attorneys, and third parties in which they explicitly discuss how to create documents, after the fact, that would validate an insurance claim, as well as specific actions taken by the client in response to the advice. *Felman Production, Inc.*, 271 F.R.D. at 137.

**C. Any deposition of Ms. Finck must be strictly limited to non-privileged and non-protected documents, topics, and time periods.**

For all the reasons stated in detail above as to the need to protect Ms. Finck and UA from Plaintiff's improper document subpoena, the deposition subpoena must also be limited under Rules 26(c)(1) and 30(d)(3)(A). Despite Plaintiff's earlier representations to the Court that she is not seeking UA's privileged and protected materials, Plaintiff has made clear that she is still seeking privileged and protected documents, and related deposition testimony from Ms. Finck. **Ex. P**, A. Askew email (Apr. 29, 2021) (noting Plaintiff's counsel's refusal to agree to proper limits on the scope of a potential deposition of Ms. Finck). Plaintiff continues to assert, without a proper basis, that the crime-fraud exception waived any privilege or protection in the documents sought. Plaintiff did not respond substantively to Ms. Finck's or UA's requests for clarification as to whether the crime-fraud exception could even be applied in the manner urged by Plaintiff under West Virginia law, and if it could, what evidence Plaintiff is relying on beyond the mere allegations of her Amended Complaint (which have nothing to do with Ms. Finck).

Counsel for Ms. Finck and UA also pointed out that Plaintiff's Subpoenas are a duplicative and improper attempt to end-around on discovery directed to, and objected to by, UA. **Ex. P** (A. Askew email Apr. 29, 2021). Rather than deal directly with UA's objections to Plaintiff's discovery requests seeking the same information, Plaintiff served the Subpoenas on Ms. Finck. This type of maneuver is improper under Rule 26(g). *See Richardson v. Sexual Assault/Spouse Abuse Research Center, Inc.*, 270 F.R.D. 223, 226 (D. Md. 2010). Plaintiff provided no response regarding this issue.

Instead, Plaintiff even went so far as to gin up a new basis to invade UA's privileged and protected documents and communications by misrepresenting the effect of a previous order by the Northern District of West Virginia in the Pajak litigation. **Ex. R**, L. Rector email (Apr. 30, 2021).

This argument misrepresents what was disputed, Plaintiff's position on that dispute, and the Court's rulings on those disputes.  **Ex. S**, A. Askew email (May 3, 2021).  In sum, Plaintiff agreed and represented to the Court that she would not seek privileged or protected information, and U.S. Magistrate Judge Aloi based the Court's ruling on that limitation.  *Id.* (citing ECF No. 236 at 2-3).  Under Armour objected to that order, which objections were overruled.  Nothing about the Court's Order overruling UA's objections had any effect on Judge Aloi's underlying ruling.

Plaintiff's demonstrably inaccurate position on this issue reflects the reality that she will stop at nothing to attempt to reach beyond UA's and Ms. Finck's legitimate privilege and work-product protections.  UA's and Ms. Finck's request for Plaintiff to properly limit the topics on which Ms. Finck may be questioned, respecting the privilege and work-product protection, have been rebuffed.  **Ex. P**.  This Court's intervention is regrettably required.  As a sensible compromise, UA and Ms. Finck produced non-privileged documents that pertain to Relativity Fest 2019 (and will supplement that production with any additional discoverable information), despite the lack of relevance of that information to the claims or defenses in the Pajak litigation.  The scope of any deposition of Ms. Finck must be limited to only what is contained in those documents, and with Plaintiff's agreement (consistent with earlier representations) that the questioning will not seek to invade the attorney-client privilege or work-product protection.  The alternative would promise to be an extended cycle of objections to deposition questions, instructions not to answer on privilege grounds, and requests for the witness to leave the room for colloquies of counsel.  This case warrants a protective order to avoid this type of likely scenario.

## V.   Conclusion

For all of the foregoing reasons, Defendants Under Armour, Inc. and Under Armour Retail, Inc. and Non-Party Nicole Finck request that the Court enter an order quashing the Subpoenas for

documents and for deposition served on Ms. Finck, and enter a Protective Order in the form attached.

Respectfully submitted,

Dated:  May 7, 2021

_____/s/_____
Philip M. Andrews (Bar No. 00078)
Amy E. Askew (Bar No. 26709)
Justin A. Redd (Bar No. 18614)
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
(410) 752-6030
(410) 539-1269 (fax)
pandrews@kg-law.com
aaskew@kg-law.com
jredd@kg-law.com

*Attorneys for Under Armour, Inc.
and Under Armour Retail, Inc.*